**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| COLTON CHILDS and JOSEPH SHOFET, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Academy, Ltd. d/b/a Academy Sports + Outdoors,<br><br>Defendant. | Civil No.:4:26-cv-07181<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Colton Childs and Joseph Shofet ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this Class Action Complaint against Defendant Academy, Ltd. d/b/a Academy Sports + Outdoors ("Defendant" or "Academy"). Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1. The unauthorized collection of a person's search activity, website interactions, personal identifiers, and device identifiers constitutes an invasion of the most basic expectation of privacy in one's online life. When a company affirmatively represents that users may control whether their data is sold, shared, or tracked, but then secretly sells, shares, and tracks that data anyway, the misconduct is especially egregious.

2. Academy is a leading American sporting goods and outdoor recreation retailer engaged in the marketing, distribution, and sale of sporting goods, outdoor equipment, apparel, footwear, and related products. Founded in 1938, Academy operates hundreds of retail stores

across the United States and offers products for sports, fitness, hunting, fishing, camping, and outdoor recreation from both national brands and its own private-label brands. Through its commercial website, https://www.academy.com/ (the "Website"), Academy provides consumers with the ability to browse and purchase sporting goods, outdoor equipment, apparel, footwear, and related products. In fiscal year 2025, Academy reported approximately $6.05 billion in net sales.[1]

3. Like many modern websites, the Website displays a data privacy banner (the "Privacy Banner") and a cookie preferences interface (the "Cookie Settings") purporting to give users meaningful control over what data the Website shares with third parties.

4. Defendant's assurances are false. The Website begins placing and transmitting cookies and other third-party tracking technologies (the "Tracking Tools") capable of transmitting users' data the moment users visit the Website, before they can interact with the Privacy Banner or select their preferences in the Cookie Settings.

5. Users, including Plaintiffs, were misled by Defendant's Privacy Banner and Cookie Settings, which inform users that their data would only be exposed to "other companies" by consenting to the use of Targeting cookies.

6. The Tracking Tools collect detailed interaction and behavioral data, including users' selections of links, buttons, forms, and other on-page elements, as well as information entered into search fields. This data may include webpages and products viewed or purchased; inferred interests, preferences, age, location, or other characteristics based on users' behavior and

[1] *Academy Sports + Outdoors Reports Fourth Quarter and Fiscal 2025 Results*, ACADEMY SPORTS + OUTDOORS (Mar. 17, 2026) https://investors.academy.com/news-releases/news-release-details/academy-sports-outdoors-reports-fourth-quarter-and-fiscal-2025 (last visited July 22, 2026).

content engagement; and personal, device, and technical identifiers such as device type, operating system, and browser type. The data also includes persistent identifiers that enable recognition of users across sessions and websites, and personal identifiers that associate users with individual profiles, as well as users' email addresses and approximate geolocation information derived from IP addresses or similar signals. Collectively, this information is referred to herein as "Sensitive Information." This Sensitive Information is collected the moment a user arrives on the Website.

7. The Website offers users the ability to limit the use and sharing of personal data through the Privacy Banner and Cookie Settings interface. Specifically, users may: (1) click the "Reject All Marketing Cookies" option in the Privacy Banner to reject the use of marketing cookies; or (2) click "Keep All Cookies". In addition, users may access the "Cookie Choices" interface to manage their cookie selections by toggling categories such as "Targeting" and "For Optimal Experience" cookies, and then clicking "Confirm" to save their preferences. However, even after users affirmatively reject all unnecessary cookies ("unnecessary cookies" refers to Targeting and Marketing Cookies, as defined by the Defendant), the Website continues to utilize and deploy Tracking Tools which transmit users' data to the advertising, social media, and analytics companies that designed and operate the Tracking Tools, in real-time, including Meta/Facebook, Microsoft, and Tealium (collectively referred to herein as the "Tracking Entities").

8. Plaintiffs' experiences reflect the conduct described above. Plaintiffs, residents of Texas and California, visited Defendant's Website in July 2025 and January 2026, respectively, for ordinary consumer purposes, including browsing and searching for specific content related to tennis and men's footwear.

9. While accessing the Website from their home states, Plaintiffs encountered the Website's Privacy Banner and Cookie Settings. Plaintiffs affirmatively rejected the Website's use of Tracking Tools other than strictly necessary cookies, relying on Defendant's representations that Tracking Tools would not be deployed by the Website without their consent. Despite these actions and expectations, the Website deployed Tracking Tools that automatically intercepted Plaintiffs' Sensitive Information and transmitted Plaintiffs' Sensitive Information to the Tracking Entities.

10. In each instance, Plaintiffs reasonably relied on Defendant's representations regarding data privacy controls and privacy protections, yet their Sensitive Information was nonetheless collected and shared against their express rejection. Plaintiffs were thereby subjected to unauthorized disclosure of their communications and deprived of the benefit of the privacy choice that Defendant represented users could obtain through rejecting the use of Tracking Tools.

11. Accordingly, Defendant violated the federal Wiretap Act, 18 U.S.C. § 2510, et seq.; California's Invasion of Privacy Act ("CIPA"), including Cal. Penal Code §§ 631 (illegal wiretapping), California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq.; and common law, including invasion of privacy, intrusion upon seclusion, fraud and deceit, and unjust enrichment. Plaintiffs bring this action on behalf of themselves and a putative class of similarly situated persons who were harmed by Defendant's deceptive and unlawful surveillance practices.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e). This Court has supplemental jurisdiction over the non-federal claims in this action. This Court also has jurisdiction over this

action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332 (d)(2)(A).

13. This Court has personal jurisdiction over Defendant because Defendant is registered to do business in this District and maintains its principal place of business in this District.

14. Venue is proper in this Court because Defendant's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

15. Plaintiff Colton Childs is, and at all relevant times has been, a citizen of the State of Texas. Plaintiff Childs accessed and used Defendant's Website while physically located in Texas. Most recently, Plaintiff Childs visited the Website on or about July 2025. During his visit in July 2025, Plaintiff Childs used the Website and entered search terms related to tennis products and equipment. Plaintiff Childs did not create an account or make a purchase. In connection with his most recent visit to Defendant's Website on or about July 2025, Plaintiff Childs was presented with Defendant's Privacy Banner and affirmatively rejected all unnecessary cookies. Plaintiff Childs reasonably believed that, after rejecting non-essential cookies and absent any affirmative consent to tracking technologies, his browsing activity would not be tracked beyond what was strictly necessary for the Website's basic functionality. Despite Plaintiff Childs's lack of consent to tracking, Defendant deployed third-party Tracking Tools that intercepted, recorded, and

transmitted Plaintiff Childs's Sensitive Information to the Tracking Entities. These Tracking Tools operated despite Plaintiff Childs's express rejection of unnecessary cookies. As a result, Plaintiff Childs's Sensitive Information was intercepted and disclosed without his consent. Had Plaintiff Childs known that Defendant would deploy Tracking Tools and disclose his information to third parties despite his rejection of non-essential cookies, he would not have continued to use the Website.

16. Plaintiff Joseph Shofet is, and at all relevant times has been, a citizen of the State of California. Plaintiff Shofet accessed and used Defendant's Website while physically located in California. Most recently, Plaintiff Shofet visited the Website on or about January 2026. During his visit, in January 2026, Plaintiff Shofet browsed the Website and searched for men's shoes. Plaintiff Shofet did not create an account or make any purchase. In connection with his most recent visit to Defendant's Website on or about July 2025, Plaintiff Shofet was presented with Defendant's Privacy Banner and affirmatively rejected all unnecessary cookies. Plaintiff Shofet reasonably believed that, after rejecting unnecessary cookies, his browsing activity would not be tracked beyond what was strictly necessary for the Website's basic functionality. Despite Plaintiff Shofet's lack of consent to tracking, Defendant deployed third-party Tracking Tools that intercepted, recorded, and transmitted Plaintiff Shofet's Sensitive Information. These Tracking Tools operated despite Plaintiff Shofet rejecting non-essential cookies and never providing affirmative consent to non-essential Tracking Tools. As a result, Plaintiff Shofet's Sensitive Information was intercepted and disclosed without his consent. Had Plaintiff Shofet known that Defendant would deploy Tracking Tools and disclose his information to third parties despite his rejection of non-essential cookies, he would not have continued to use the Website.

17. Defendant Academy, Ltd. d/b/a Academy Sports + Outdoors is a for-profit limited partnership organized under the laws of the State of Texas, with its principal executive offices located in Katy, Texas, and is registered to conduct business throughout the United States, including in the State of California. Defendant is a leading sporting goods and outdoor recreation retailer that markets and sells sporting goods, outdoor equipment, apparel, footwear, and related products through its retail stores and its commercial website located at https://www.academy.com.

## FACTUAL ALLEGATIONS

### I. How Websites Function

18. Websites are hosted on servers, in the sense that their files are stored on and accessed from servers. Websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

19. When a user navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the address), that user's browser contacts the DNS (Domain Name System) server, which translates the web address of that website into a unique IP (Internet Protocol) address.[2]

20. An IP address is "a unique address that identifies a device on the Internet or a local network."[3] In essence, an IP address is defined as follows:

[2] *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited May 7, 2026).
[3] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited May 7, 2026).

> The identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works.[4]

21. When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address (the "Request URL"). This request is for the specific resource located at the URL. If the server fulfills this request, it issues an HTTP response that includes the request status and, typically, the requested content. This content is then transmitted in small chunks, known as data packets, and reassembled into the complete webpage by the user's browser upon arrival.[5]

22. This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.

23. The Request URL typically contains parameters. Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters. Parameters direct a web server to provide additional context-sensitive services.

24. Website owners or web developers write and manage the URLs for their websites.

25. Similarly, parameters and metadata can be parsed and separated into easily reviewed, searchable formats.

---

[4] *Id.*
[5] *Id.*




*Figure 1 – Request URL of sample webpage, encoded for transmission (compare with decoded URL in Figure 2)*




*Figure 2 – Decoded, parsed data from Request URL in Figure 1, showing easy-to-read parameters and metadata*




*Figure 3 – Microsoft UET tracking a user's communications on the Website's search page*




*Figure 4 – Payload of Microsoft UET tracking a user's communications on the Website's search page*




*Figure 5 – Cookies placed by and received by Microsoft on the Website's search page*

26. After sending the Request URL, and after the server responds to the Request URL, the user's browser assembles the packets sent by the server back into the HTML code of the webpage, which is then processed by the user's browser as it arrives,[6] and rendered into a visual display according to the instructions of the HTML code.[7] This is the visible, and usually interactive, website that most people think of.

27. URLs are created by the owner of the website.

---

[6] This processing of webpage data as it arrives is called "parsing," and allows web browsers to convert raw data received over the internet into structured data objects used by the renderer built into the browser to create images on the screen. In short, unless a software command, like a Tracking Tool, is physically last to arrive at a device, it is loaded and executed before the communication has finished being received. *See Populating the page: how browsers work*, MOZILLA, https://developer.mozilla.org/en-US/docs/Web/Performance/Guides/How_browsers_work (last visited Feb. 17, 2026).

[7] *What Is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Feb. 17, 2026).

28. To provide more complex website functionality, website developers will include more complex commands written in other computer programming languages, such as JavaScript snippets, within the HTML documents.[8]

29. Such complex tasks include code used to monitor and report users' activity.

30. In short, the Internet relies on a constant back-and-forth stream of requests and responses between a user's browser and a website's stored coding and data. Importantly, the requests and responses provide a perfect snapshot of everything a user does (or does not do) on a website, and when and how they do it, and with what software and hardware.

## II. Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookies and Tracking Tools

31. Defendant voluntarily integrated Tracking Tools from at least one Tracking Entity into its Website's programming. Defendant's use of such Tracking Tools on its Website is performed pursuant to commercial agreements between Defendant and third parties, including at least one Tracking Entity. The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website's server to a user's web browser and stored locally on the user's device. Cookies typically contain unique identifiers that enable a website to recognize and differentiate individual users. These cookie files are automatically transmitted back to web servers through HTTP requests, allowing the Website and Tracking Entities to identify the device making the request and to record a session reflecting how the user interacts with the Website, i.e., everything they view, click on, type, or even hover over.

---

[8] *See JavaScript: Adding interactivity*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Feb. 17, 2026).

32. First-party cookies are those placed directly on the user's device by the web server with which the user is knowingly communicating, in this case, Defendant's Website. First-party cookies are commonly used to recognize users across repeated visits to the same website and to track their on-site activity. Third-party cookies are placed by domains other than the Website's domain, such as google.com and other advertising or analytics domains. When a user's browser loads a webpage containing embedded third-party resources, the third party's scripts determine whether its cookies already exist on the user's device and, if not, cause those cookies to be stored. These third-party cookies contain unique identifiers that allow Tracking Entities to recognize and track individual users across different websites, including the Website, and across multiple browsing sessions.

33. As detailed further below, Tracking Tools, including first- and third-party cookies, that are placed on users' devices during interactions with the Website are subsequently used to intercept and record users' communications by the Tracking Entities, enabling them to surreptitiously track and collect Website users' Sensitive Information in real time. Tracking Tools serve numerous commercial purposes, including: (i) analytics, such as measuring user engagement and Website performance; (ii) personalization, including remembering users' preferences; (iii) advertising and targeting, including delivering targeted or behavioral advertisements based on users' profiles; and (iv) social media integration.

34. Ultimately, Tracking Tools enable Defendant and Tracking Entities to earn more money and enhance marketing effectiveness through the collection, analysis, and dissemination of users' Sensitive Information, especially as that Sensitive Information is used to build detailed marketing profiles of users to enhance the effectiveness and efficiency of Tracking Entities' and Defendant's marketing efforts.

35. When users interact with the Website by navigating pages, clicking links, or entering information, they communicate directly with Defendant. Defendant chooses to place the Tracking Tools on the Website so that, when users visit the Website, both first-party and third-party cookies are placed on users' devices and/or monitored and transmitted to the Tracking Entity associated with each Tracking Tool, combined with parameters, metadata, and detailed Request URLs. Because Defendant controls the Website's software code and determines which Tracking Tools are loaded onto users' browsers, Defendant has control over whether these Tracking Tools are placed and whether users' Sensitive Information is transmitted to Tracking Entities. Defendant's explanation as to its use of Tracking Tools on the Website is contained in the Cookie Settings: Cookies and similar technologies typically collect information about how you use a website, such as pages and content you view, information you submit, digital tools you use, and links you click. Depending on your interactions with us, this information may suggest certain details about your health, which may be considered sensitive.[9]

36. The Cookie Settings state that users can decline unnecessary cookies, including targeting cookies,

37. The Cookie Settings further represent that "Functional Cookies" are used for the Website to function and enhance personalization:

> **Functional Cookies**
>
> Functionality cookies enable the website to provide enhanced functionality and personalization.

38. The Cookie Settings further represent that "Performance Cookies" are used to measure the performance of the Website:

---

[9] *See Figures 6* and *7*, which depict Defendant's Privacy Banner and Cookie Settings.

> **Performance cookies**
>
> Performance cookies allow us to measure and improve the performance of our site.

39. The Cookie Settings further represent that "Targeting Cookies" are used to collect information for personalized advertising:

> **Targeting cookies**
>
> Targeting cookies collect information that is used, for example, to serve personalized ads for Academy products or services or the products or services of other companies.

40. Defendant's Privacy Banner and Cookie Settings clearly inform users that their detailed browsing activity and interactions with the Website would ***not*** be captured and transmitted to Tracking Entities via the use of cookies through the Tracking Tools, which are capable of aggregating and monetizing that information across multiple websites, when users affirmatively rejected the use of unnecessary cookies.

## III. The Website's Privacy Banner and Cookie Settings Misled Users

41. When users visited the Website, the Website immediately displayed the Privacy Banner that stated:

> Academy uses cookies and similar technologies to improve your experience. Please see our Privacy Policy and Terms and Conditions. Learn more about your Cookie Choices.[10]

42. The Privacy Banner presented users, including Plaintiffs, with options to "Keep All Cookies" or "Reject All Marketing Cookies," as well as hyperlinks to Defendant's Privacy Policy, Terms and Conditions, and Cookie Choices. Upon selecting either "Keep All Cookies" or "Reject All Marketing Cookies," the Privacy Banner disappeared from view.

---

[10] *See Figures 6* and *7*, which depict Defendant's Privacy Banner and Cookie Settings.




*Figure 6 – The Website's Privacy Banner representing that users could change the Website's tracking behavior*




*Figure 7 – The Website's Cookie Settings, representing that users could change the Website's tracking behavior*

43. Website users who selected the "Cookie Choices" option were presented with the Cookie Settings, which represented that users could control how their Sensitive Information was collected and shared by accepting only necessary cookies.

44. After users clicked the "Reject All Marketing Cookies" button, the Cookie Settings window disappeared.

45. The representations made by Defendant in the Privacy Banner and Cookie Settings led Plaintiffs, and all Website users similarly situated, to believe that they had disabled all but strictly necessary cookies via their express rejection. The Privacy Banner and Cookie Settings further reasonably led Plaintiffs and all reasonable users to believe that Defendant would not allow Tracking Entities, through cookies or similar technologies, to access users' Sensitive Information. Plaintiffs acted on those representations by interacting with the Website after making privacy selections intended to reject any sharing of their personal information and use of any Tracking Tools other than required cookies.

46. These representations were false. Defendant did not abide by Plaintiffs' expressed preferences and does not abide by users' expressed preferences. When users choose to decline all unnecessary cookies, they clearly communicate that they do not consent to the placement or transmission of cookies other than those required for functionality. Nevertheless, Defendant continued to cause the Tracking Tools, including cookies, to be placed or otherwise accessed on users' browsers and devices so that Tracking Entities could intercept, transmit, and use users' Sensitive Information in real time.

## IV. Defendant's Website Uses Tracking Tools Users

47. Defendant operates the Website and has installed Tracking Tools on the Website created by Tracking Entities. These Tracking Tools operate invisibly, tracking Website users' activity surreptitiously by intercepting users' Sensitive Information as it arrives at or is sent from users' devices, copying the contents of those communications, and generating new Request URLs that are transmitted to the Tracking Entities.

### A. The Meta Pixel

48. Facebook offers its own tracking pixel known as the Facebook or Meta Pixel (the "Meta Pixel") to website owners for the purpose of monitoring user interactions on their websites, which can then be shared with Facebook.

49. The Meta Pixel is a marketing tool that can only be added to a webpage by website developers. A website operator must sign up for a business account or link a related Facebook account with its Pixel and then add code to the website to make use of the Meta Pixel.[11]

50. Upon creating a Meta Pixel, a Pixel ID (also called a DataSet ID by Meta) is generated.[12] This Pixel ID is used to initialize the Meta Pixel, either by allowing Meta to fetch a predetermined library of code related to that ID, or otherwise by identifying the website owner's Facebook account used to receive the collected data when programming the Pixel directly into a website.[13]

51. This Pixel ID must match "a known Pixel ID" in Meta's system,[14] and is transmitted by the Meta Pixel.[15]

---

[11] *Setup and install the Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited Feb. 17, 2026).
[12] *Id.*
[13] *Get Started*, FACEBOOK (updated June 30, 2026) https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Mar. 18, 2026) ("To install the Pixel, add its base code… on every page where you will be tracking website visitor actions.").
[14] *Pixel Helper*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/support/pixel-helper (last visited Feb. 17, 2026).
[15] *Meta Pixel*, FACEBOOK (updated Nov. 15, 2023) https://developers.facebook.com/docs/meta-pixel/ (last visited Feb. 17, 2026).

52. As Facebook notes, the Meta Pixel must be added to each individual page that a website owner wishes to be tracked.[16]

53. Defendant places the Meta Pixel on the Website to gather, collect, and then transmit user information to Facebook.[17] Defendant and Facebook use this information to build valuable personal profiles for Website users to inform their targeted advertising campaigns, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[18] Defendant directly benefits from the use of the Meta Pixel by using these profiles for advertising.

54. The harvested data improves Defendant's advertising by pinpointing audience demographics by interests, gender, or location, and finding the people who are most likely to take action and view content.[19]

55. Once implemented on a website, the Facebook Pixel begins to share users' information the moment a user lands on the website.

56. When a Facebook user logs onto Facebook, tracking cookies, including the "c_user" cookie, the data cookie, and the "fr" cookie, are automatically created and stored on the

---

[16] *Get Started*, FACEBOOK, (updated June 30, 2026) https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Mar. 18, 2026) ("To install the Pixel, add its base code… on every page where you will be tracking website visitor actions.").

[17] The Facebook Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and to share a tracked user's data with Facebook. *See Meta Pixel*, FACEBOOK (updated Nov. 15, 2023) https://developers.facebook.com/docs/meta-pixel/ (last visited Feb. 17, 2026).

[18] *See Meta Pixel*, FACEBOOK (last visited Feb. 17, 2026).

[19] *See Audience ad targeting*, FACEBOOK, https://www.facebook.com/business/ads/ad-targeting (last visited Feb. 17, 2026).

user's device.[20] These cookies allow Facebook to link the data it receives through the Meta Pixel to individual Facebook users.

57. The c_user cookie, for example, contains a series of numbers (the user's Facebook ID, or "FID") to identify a user's profile.




*Figure 8 – Sample c_user cookie, containing FID of test account created by Plaintiffs' counsel to investigate the Facebook Pixel*

58. The FID can simply be appended to www.facebook.com/ to navigate to the user's profile (e.g., www.facebook.com/[FID]). Appending the FID from *Figure 8* to the Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832) redirects the webpage straight to the Facebook profile associated with the UID, as depicted below:

---

[20] *Cookies Policy: What are cookies, and what does this* policy cover?, FACEBOOK (Dec. 12, 2023) https://www.facebook.com/policy/cookies/ (last visited Feb. 17, 2026).




*Figure 9 – Sample Facebook account created by Plaintiffs' counsel to investigate the Facebook Pixel, with FID highlighted in URL*

59. The Meta Pixel tracks user activity on web pages by monitoring events,[21] which, when triggered, causes the Pixel to automatically send data—users' Sensitive Information—directly to Facebook.[22] Examples of events utilized by websites include a user loading a page with a Pixel installed (the "PageView event") and a user clicking a button on a page (the

---

[21] *About Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Feb. 17, 2026).
[22] *Id.*

"SubscribedButtonClick" event) (collectively, the "Pixel Events").[23] The Website utilizes the Pixel Events.[24]

60. The Meta Pixel also transmits Defendant's unique Pixel ID via the "id" parameter, which contains Defendant's Pixel ID of "821679564580187" for the purpose of matching the harvested data to Defendant's Website.

61. Defendant uses the Meta Pixel to monetize Website users' Sensitive Information.

62. Facebook independently benefits from the data collected through the Meta Pixel by using the harvested data to sell targeted advertising services. Facebook benefits from intercepting and analyzing users' Sensitive Information by refining its marketing algorithms and improving the effectiveness of its ad sales to all advertisers through Meta's social media platforms to target Meta's users, profiting from the ability to more accurately target potential customers.

63. Meta admits that it shares users' Sensitive Information with third parties,[25] just as Plaintiffs' Sensitive Information was shared here.

64. Defendant's use of the Facebook Pixel on the Website is demonstrated by the screenshots below, which follow a user's journey on the Website.

---

[23] *Specifications for Meta Pixel standard events*, FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Feb. 17, 2026).

[24] The presence of Pixel events can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See About the Meta Pixel Helper*, FACEBOOK, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited Feb. 17, 2026).

[25] *See Privacy Policy,* META (Dec. 16, 2025) https://www.facebook.com/privacy/policy?section_id=4-HowDoWeShare (last visited Feb. 26, 2026).




*Figure 10 – Facebook Pixel tracking a user landing on the webpage from Figure 13 through the "PageView" event*




*Figure 11 – Information intercepted by the Facebook Pixel when it captures a user's communications on the Website through the "PageView" event*




*Figure 12 – Facebook Pixel tracking a user landing on the webpage from Figure 11 through the "SubscribedButtonClick" event*




*Figure 13 – Information intercepted by the Facebook Pixel when it captures a user's communications on the Website through the "SubscribedButtonClick" event*




*Figure 14 – SubscribedButtonClick Cookies transmitted by the Facebook Pixel on the Website*




*Figure 15 – Facebook Pixel tracking a user's communications on the Website's search page*




*Figure 16 – Payload of Facebook Pixel tracking a user's communications on the Website's search page*




*Figure 17 – Cookies placed by and received by Facebook Pixel on the Website's search page*

65. When a business applies to use the Meta Pixel, it is provided with details about its functionality and its impact on private information.[26] Plaintiffs and Website users, however, are not provided this information and would have no reason to look for it, as they are not a party to Defendant's agreement with Facebook.

66. To make use of the Meta Pixel, Defendant agreed to Facebook's Business Tool Terms (the "Facebook Terms").

67. The Facebook Terms inform website owners using the Meta Pixel that the employment of the Meta Pixel will result in data sharing, including with Facebook, through the automatic sharing of Pixel Event information and contact information.[27]

68. The Facebook Terms are transparent that Meta will use the Pixel Event information and contact information "to match the contact information against user IDs, as well as to combine those user IDs with corresponding [Pixel Event information]."[28]

69. Facebook directs parties implementing the Meta Pixel—here, Defendant—to encrypt request information[29] *before* data can be shared.[30]

---

[26] *See Get Started*, FACEBOOK (updated June 30, 2026) https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Mar. 18, 2026). (The Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can their actions in the Facebook Ads Manager so you can use the data…. By default, the Pixel will track URLs visited [and] domains visited….").

[27] *Meta Business Tools Terms*, FACEBOOK (Nov. 3, 2025) https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Feb. 17, 2026).

[28] *Id.*

[29] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent. Defendant has specifically chosen the Facebook Pixel method, which makes users' information visible. *See id.*

[30] *Id.*

70. Facebook further provides Meta Pixel users, such as Defendant, guidance on responsible data handling and details how data is acquired, used, and stored, including which information is shared with Facebook.

71. Facebook educates or reminds Meta Pixel users of their responsibility to inform their users of their website's data sharing and specifically guides website owners to obtain the requisite rights, permissions, or consents before sharing information with any third party.[31]

72. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Meta Pixel and ignored Facebook's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private information.

**B. Microsoft UET**

73. Microsoft offers Microsoft Advertising (formerly known as "Bing Advertising"), a platform where advertisers can display ads to consumers across the internet based on their search terms and interests.[32]

74. One of the software tools available through Microsoft Advertising is Universal Event Tracking ("UET"), which allows website owners, like Defendant, to allow Microsoft to track conversion events on a website, target specific audiences, and automate advertisement

---

[31] *Best practices for privacy and data use for Meta Business Tools*, META, https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited Feb. 17, 2026).
[32] *Bing Ads API Overview,* MICROSOFT, https://learn.microsoft.com/en-us/advertising/guides/?view=bingads-13 (last visited Feb. 25, 2026).

bidding. Defendant uses the information collected by UET to maximize the performance of the advertising on the Website.[33]

75. UET is a tag that is placed on a website. Once UET is installed, the tag reports all users' activity on the website to Microsoft Advertising.[34]

76. UET uses several cookies, which it stores and/or accesses on website visitors' browsers. These cookies include the MR cookie, the MUID cookie, which contains a globally unique ID assigned to a visitor's browser that identifies them,[35] the _uetsid cookie, which contains a session ID, and the _uetvid cookie, which contains a unique ID for a unique website visitor.[36]

77. UET can collect a vast amount of data from website visitors. The MUID/GUID cookie and the visitor's IP address are always passed to Microsoft with every HTTP request from UET. UET can also collect:

- Event actions
- Event categories
- Event types
- Browser language setting
- Page URLs
- Referrer URLs
- Screen height

---

[33] *What is UET and how can it help me?,* MICROSOFT, https://help.ads.microsoft.com/#apex/ads/en/56681/2 (last visited Feb. 25, 2026).

[34] *What is UET and how does it related to conversion tracking and remarketing features?,* MICROSOFT, https://help.ads.microsoft.com/#apex/ads/en/53056/2-500 (last visited Feb. 25, 2026).

[35] *Guid Struct,* MICROSOFT, https://learn.microsoft.com/en-us/dotnet/api/system.guid?view=net-10.0 (last visited Mar. 3, 2026).

[36] *What cookies does UET use?,* MICROSOFT, https://help.ads.microsoft.com/#apex/ads/en/53056/2-500 (last visited Feb. 25, 2026).

- Session ID
- The UET tag ID
- A signed-in user's ID
- A visitor ID[37]

78. Defendant's use of UET on the Website is shown in the figures below.




*Figure 18 – UET tracking users' communications on the Website*

[37] *What data does UET collect once I install it on my Website?*, MICROSOFT, https://help.ads.microsoft.com/#apex/ads/en/53056/2-500 (last visited Feb. 25, 2026).




*Figure 19 – Information intercepted by UET tracking users' communications on the Website*




*Figure 20 – Cookies transmitted by UET on the Website*

79. Microsoft informs UET-using websites that they are responsible for managing visitor consent. Websites are instructed to place the "_uetmsdns" cookie as a first-party cookie and set the value to 1 to stop events from firing and respect visitor consent choices, should they not accept the use of trackers.[38]

80. Defendant failed to place this cookie on the Website and did not stop UET events from triggering when visitors declined the use of cookies.

**C. Tealium**

81. Academy deploys Tealium, Inc.'s tag-management and consumer-data-platform software on the Website (collectively, "Tealium"), including Tealium iQ Tag Management and the Tealium Collect Tag.

[38] *How can I stop UET events from being fired for users who request to restrict data sharing?*, MICROSOFT, https://help.ads.microsoft.com/#apex/ads/en/53056/2-500 (last visited Feb. 25, 2026).

82. Tealium describes itself as a "suite of software-as-a-service products that helps organizations collect, unify, and manage their customer data across all digital touch-points."[39] Tealium loads onto a user's browser and captures a mix of predefined data and dynamic data from the page, including user communications on the Website.[40]

83. Defendant uses the Tealium Tag to identify visitors to the Website and to add information about any users to pre-existing identity profiles.[41]

84. Tealium also creates and persists unique visitor identifiers that allow Academy and its data partners to correlate a single user's activity across browsing sessions, devices, and platforms using the TAPID cookie.[42]

85. Tealium uses the collected data to improve and monitor the performance of its own services and products.[43]

---

[39] *Privacy and Cookie Notice*, TEALIUM INC., https://tealium.com/privacy-notice/ (last visited July 21, 2026).
[40] *Tealium Collect Tag Setup* Guide, TEALIUM, https://docs.tealium.com/client-side-tags/tealium-collect-tag/ (last visited July 21, 2026).
[41] *Id.*
[42] *About TAPID Cookies*, TEALIUM, https://docs.tealium.com/server-side/visitor-stitching/tapid/ (last visited July 21, 2026).
[43] *FAQ for Tealium Master Services Agreement*, TEALIUM, https://tealium.com/download/legal-americas-msa-2024/ (last visited Aug. 14, 2026)




*Figure 21 – User's browser being compelled to send communication to Tealium while communicating with the Website*




*Figure 22 –Tealium capturing a user's communications with the Website*




*Figure 23 – Cookies of Tealium used to identify a user sent with duplication of user's communications with the Website*




*Figure 24 – Tealium tracking a user's communications on the Website's search page*




*Figure 25 – Payload of Tealium tracking a user's communications on the Website's search page*




*Figure 26 – Cookies placed by and received by Tealium on the Website's search page*

## V. The Tracking Entities Intercepted the Contents of Communications Between Plaintiffs and the Website in Transit

86. Transmitted URLs that include both the path and query string reflect the substance of a user's communication and therefore constitute content.

87. Here, the network requests intercepted by the Tracking Entities included detailed Request URLs created by Defendant containing the names and file locations of webpages, the detailed URLs and content Plaintiffs requested and accessed on the Website, identifying information in the form of cookies, and users' activity information reflecting their interactions with the Website.

88. The Tracking Tools intercepted the contents of Plaintiffs' communications contemporaneously with Plaintiffs' interactions with the Website. The Tracking Tools began transmitting data to the Tracking Entities as soon as the Tracking Tools loaded onto Plaintiffs' browsers, and additionally transmitted data at the moment Plaintiffs submitted information through the Website.

89. This interception, duplication, and transmission occurred inside Plaintiffs' browsers, before the communications fully reached users' devices, or otherwise before the communications were transmitted from users' devices, and therefore occurred while the communications were in transit.

90. The Tracking Entities were third parties to Plaintiffs' communications with Defendant, and intercepted, read, duplicated, and retransmitted users' data while it was in transit.

91. Defendant's deployment of the Tracking Tools enabled Tracking Entities to intercept Request URLs that specified the content Plaintiffs accessed on the Website, in violation of CIPA at Cal. Penal Code § 631 and the federal Wiretap Act at 18 U.S.C. § 2511(1)(a).

## VI. Defendant Procured Tracking Entities and Aided Tracking Tool Interceptions and Used the Intercepted Communications

92. Defendant knowingly procured the Tracking Entities to embed and configure the Tracking Tools in its Website, in a manner that enabled the Tracking Entities to intercept the contents of Plaintiffs' communications with the Website.

93. Defendant used the information from the intercepted communications to improve its own marketing, advertising, and analytics, while knowing that the communications were intercepted without Plaintiffs' consent.

94. Defendant did not obtain Plaintiffs' express or implied consent to allow the Tracking Entities to intercept those communications, before or after the interceptions occurred, nor could Defendant consent to the interception of those communications, as the scope of its consent was bound to the Terms provided by the Tracking Entities, which required obtaining valid prior consent from Plaintiffs and/or otherwise prohibited the use of the Tracking Tools for intercepting sensitive or legally protected data.

## VII. The Tracking Tools Are Trap and Trace and/or Pen Register Devices

95. California law defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

96. California law defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

97. The Tracking Tools are processes to identify the source of electronic communication by capturing incoming electronic impulses and identifying dialing, routing, addressing, and signaling information generated by users, who are never informed that the website is collaborating with the Tracking Entities to obtain their IP address and other identifying information. As such, the Tracking Tools are "trap and trace" devices.

98. The Tracking Tools are processes that record and decode routing and addressing information transmitted by electronic communication by capturing incoming electronic impulses and identifying dialing, routing, addressing, and signaling information generated by users, who are never informed that the website is collaborating with the Tracking Entities to obtain their IP address and other identifying information. As such, the Tracking Tools are "pen register" devices.

99. Defendant is "a provider of electronic or wire communication service" because they provide the Website, where users send electronic communications. Cal. Penal Code § 638.51(b).

100. The Tracking Tools are "reasonably likely" to identify the source of incoming electronic impulses as well as recording the routing and addressing information. In fact, they are designed specifically for that purpose. The IP addresses, detailed URLs, cookies, and Google IDs disclosed through the use of the Tracking Tools identify: (i) the source and destination of incoming signals to Plaintiffs' devices to the Tracking Entities; and (ii) the source and destination of outgoing signals from Plaintiffs' devices.

101. Defendant did not obtain Plaintiffs' express or implied consent to be subjected to data sharing with the Tracking Tools for the purposes of digital fingerprinting and de-anonymization.

102. Defendant did not obtain Plaintiffs' or the Class members' express or implied consent to be subjected to data sharing with the Tracking Entities for the purposes of fingerprinting and de-anonymization, nor did Defendant obtain a court order.

**VIII. Defendant Lacked Consent and Misrepresented the Effectiveness of Cookie Settings**

103. Plaintiffs' investigation revealed that the Website's default settings permitted tracking to begin as soon as users arrived on the Website, before users could click "Keep All Cookies" or "Reject All Marketing Cookies" on the Privacy Banner.

104. As a result, users were tracked from the moment they began using the Website, without prior consent.

105. Plaintiffs visited the Website while those default tracking settings were active.

106. Users who visit the Website are shown a Privacy Banner offering the option to opt in to the use of Tracking Tools, affirmatively decline their use, and the ability to modify cookie preferences.




*Figure 27 – The Cookie Banner shown to users who visit the Website*

107. Despite those representations, even users who declined all sharing of their personal information continued to be tracked by at least Facebook, Microsoft, and Tealium.




*Figure 28 – Post-rejection Facebook Pixel on the Website*




*Figure 29 – The Payload of Post-rejection Facebook Pixel on the Website*




*Figure 30 – Post-rejection Facebook Pixel's cookies on the Website*




*Figure 31 – Post-rejection Microsoft tracking on the Website*




*Figure 32 – The Payload of Post-rejection Microsoft tracking on the Website*




*Figure 33 – Post-rejection Microsoft tracking's cookies on the Website*




*Figure 34 – Post-rejection Tealium tag on the Website*




*Figure 35 – The Payload of Post-rejection Tealium tag on the Website*




*Figure 36 – Post-rejection Tealium tag's cookies on the Website*

108. Defendant intentionally shared Plaintiffs' and users' Sensitive Information with the Tracking Entities, placed tracking cookies on the Website, and allowed them to track users and intercept their communications with the Website, despite stating in the Privacy Banner and Cookie Settings that unnecessary cookies would not be used if users rejected them

109. Defendant placed, and allowed to be placed, the DSID and NID cookies from Google, the MUID cookies from Microsoft and the TAPID cookies from Tealium. These cookies identify users and allow the Tracking Entities to track users, intercept their communications, and build personal profiles based on that tracking.

110. Representations regarding cookie-consent controls are materially misleading where tracking continues despite a website's claim to the contrary and/or users' selections.

111. Defendant and the Tracking Entities benefited from the interception of Plaintiffs' communications by reading and subsequently using the intercepted contents to construct detailed

profiles reflecting Plaintiffs' browsing habits and interests, and by using those profiles for targeted advertising.[44]

112. The Tracking Entities independently benefit from the interception of communications, using data collected through the Tracking Tools to improve their advertising products and market those capabilities to other businesses.[45]

## TOLLING

113. The statutes of limitations applicable to Plaintiffs' and the Class members' claims are tolled by Defendant's wrongful conduct and by Plaintiffs' and the Class members' delayed discovery of their claims. Defendant's acts were intentionally concealed, technically complex, and inherently self-concealing, thereby preventing Plaintiffs and the Class members from discovering the unlawful disclosure of their Sensitive Information until recently.

114. Defendant not only facilitated and enabled the covert incorporation of Tracking Entities' Tracking Tools into its Website, but also, via its Privacy Banner, misrepresented its data sharing practices.

115. Defendant possessed superior and exclusive knowledge that the Tracking Entities' Tracking Tools embedded within its Website would disclose Plaintiffs' and Class members' Sensitive Information in contradiction to Plaintiffs' cookie settings preferences.

116. Plaintiffs and the Class members could not, through the exercise of reasonable diligence, have discovered the full scope of Defendant's conduct and misrepresentations because

---

[44] *[GA4] User Explorer* GOOGLE, https://support.google.com/analytics/answer/9283607?sjid=14886665613386572022-NA#zippy=%2Cin-this-article (last visited May 7, 2026).

[45] *See Data sharing settings*, GOOGLE, https://support.google.com/analytics/answer/1011397?hl=en&ref_topic=2919631&sjid=14886665613386572022-NA (last visited May 7, 2026).

the technology involved is highly technical and not reasonably discernible to ordinary users.

117. Plaintiffs and the Class members first became aware of Defendant's misconduct as a result of counsel's investigation and technical analysis conducted in advance of filing this Complaint, on or about July 22, 2026.

## CLASS ALLEGATIONS

118. Plaintiffs bring these claims for relief pursuant to the Federal Rules of Civil Procedure 23(a), 23(b)(2), or 23(b)(3) on behalf of the following Class and Subclasses (collectively "the Class").

119. Plaintiffs bring this class action individually and on behalf of the following Class:

> All natural persons who visited Defendant's Website in the United States during the applicable limitations period, who interacted with the Website's Privacy Banner and/or Cookie Settings and rejected the Website's use of unnecessary cookies, and whose electronic communications were intercepted, disclosed, and/or transmitted to the Tracking Entities through Defendant's use of the Tracking Tools (the "Class").

120. Plaintiff Shofet brings this class action individually and on behalf of the following California Subclass:

> All members of the Class who visited and interacted with the Defendant's Website during the applicable limitations period while located in the State of California (the "California Subclass").

121. Plaintiff Childs brings this class action individually and on behalf of the following Texas Subclass:

> All members of the Class who visited and interacted with the Defendant's Website during the applicable limitations period while located in the State of Texas (the "Texas Subclass").

122. Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors,

assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

123. Plaintiffs reserve the right to amend the Class and Subclass definitions above if further investigation and/or discovery reveal that the Class should be expanded, narrowed, further divided into subclasses, or otherwise modified in any way.

124. NUMEROSITY: At this time, Plaintiffs do not know the number of Class members but believe the number to be at least measured in thousands, if not millions, given the popularity of Defendant's Website. The number of persons within the Class is believed to be so numerous that joinder of all members is impractical. The exact identities of Class members may be ascertained via the records maintained by the Defendant in the ordinary course of its business.

125. COMMONALITY: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between the Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

a. Whether Defendant shared the Class members' Sensitive Information with the Tracking Entities or other third parties and/or facilitated the Tracking Entities' interception of the Class members' Sensitive Information;

b. Whether Defendant obtained effective and informed consent to do so;

c. Whether Defendant's conduct constitutes a violation of the Wiretap Act;

d. Whether the Class members are entitled to actual damages, punitive damages, and/or statutory penalties; and

e. Whether the Class members are entitled to injunctive relief.

126. TYPICALITY: As persons who visited Defendant's Website and whose personal information was shared by Defendant, Plaintiffs are asserting claims that are typical of the Class members.

127. ADEQUACY: Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class members or whose inclusion would otherwise be improper are excluded.

128. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class members is impracticable and inefficient. It would be unduly burdensome on the courts, where individual litigation of numerous cases would proceed. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for their wrongdoing as asserted herein.

## CAUSES OF ACTION

### COUNT I
### COMMON LAW INVASION OF PRIVACY
### Intrusion Upon Seclusion
### (On Behalf of Plaintiffs and the Class)

129. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

130. Defendant has intruded upon the legally protected privacy interests of Plaintiffs and the Class members by, among other things, permitting Tracking Tools to intercept and make use of users' Sensitive Information by compiling it with other user information gathered across the internet, while representing to users that they could decline such collection.

131. Plaintiffs and Class members maintained a reasonable expectation that their communications with Defendant via the Website would remain private, specifically with respect to their personal information, including browsing activity, device identifiers, and related metadata, which has been recognized as sensitive information.[46] Plaintiffs expected that their interactions with the Website would not be shared with the Tracking Entities.

132. Plaintiffs and Class members relied on Defendant's representations and exercised the Website's controls, reasonably expecting that Defendant would honor its affirmative representation in the Privacy Banner and Cookie Settings that users could decline unnecessary cookies.

133. Despite Plaintiffs' and the Class members' selections, Defendant permitted Tracking Entities to use cookies and related Tracking Tools to collect and compile users' Sensitive Information, including the categories described above. The Tracking Entities used and profited from these data to create detailed user profiles, audience segments, and targeted advertising, and to share and monetize those profiles.

134. Defendant lacked any legitimate business justification for permitting the placement and transmission of third-party cookies and Tracking Tools that allowed Tracking Entities to access, intercept, and collect users' Sensitive Information, contrary to users' express selections.

---

[46] For example, California voted to pass the California Consumer Privacy Act of 2018 ("CCPA") and voted to amend the CCPA in 2020 through Proposition 24, the California Privacy Rights Act (CPRA). The CPRA sets out that collecting and using "personal information," including real names, online identifiers, internet browsing and search history, location data, audio and visual information, etc., requires businesses to provide adequate notice of such practices. *See generally,* Cal. Civ. Code §§ 1798.100, 1798.105, 1798.106, 1798.110, 1798.115, 1798.120, 1798.140(v).

135. As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class members suffered injury, including but not limited to loss of privacy, loss of control over their personal information, diminution in value of their private data, and other compensable harms.

136. Plaintiffs and the Class members seek all available relief for this claim, including compensatory damages, restitution, disgorgement of profits, statutory and punitive damages where available, and injunctive relief to prevent further unlawful tracking.

## COUNT II
## INVASION OF PRIVACY AND VIOLATIONS OF THE CALIFORNIA CONSTITUTION, Art. 1, § 1
## (On Behalf of Plaintiff Shofet and the California Subclass)

137. Plaintiff Shofet incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

138. Plaintiff Shofet brings this cause of action on behalf of himself and all California Subclass members.

139. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

140. Plaintiff Shofet and the California Subclass members have a legally protected interest in their Sensitive Information, such as browsing activity, device identifiers, and related metadata, which Defendant violated by providing the Tracking Entities access to that data, enabling the interception of such communications.

141. Plaintiff Shofet and California Subclass members' protected interests arise from various statutes and common law, including, inter alia, the Wiretap Act, the CIPA, and the

California Constitution, which protects privacy rights and includes the "ability to control circulation of our personal information."

142. The privacy rights of Plaintiff Shofet and the California Subclass members were invaded through the interception and collection of their data, which included their Sensitive Information and other sensitive information, without first obtaining authorization or consent from Plaintiff Shofet and the California Subclass members.

143. Plaintiff Shofet and the California Subclass members had a reasonable expectation of privacy when communicating with Defendant's Website and thereby providing and/or transmitting their Sensitive Information. By causing third-party cookies and Tracking Entities to be placed on users' browsers and devices and by transmitting users' Sensitive Information to Tracking Entities despite users' selections, Defendant violated their reasonable expectation of privacy.

144. Defendant's intrusion, placing third-party Tracking Tools and enabling third-party access to users' Sensitive Information despite users' express rejection of such tracking, is and would be highly offensive to a reasonable person.

145. As a direct and proximate result of Defendant's intentional invasion of their privacy rights, Plaintiff Shofet and the California Subclass members have been harmed and are entitled to compensatory, punitive, and injunctive relief.

## COUNT III
## VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT
## Cal. Penal Code § 631
## (On Behalf of Plaintiff Shofet and the California Subclass)

146. Plaintiff Shofet incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

147. Plaintiff Shofet brings this cause of action on behalf of himself and all California Subclass members.

148. CIPA provides that a person is liable to another where, "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a).

149. The Website, the Tracking Tools, and Plaintiff Shofet's devices and browsers each qualify as a "machine, instrument, contrivance, or…other manner" used to engage in the prohibited conduct at issue here. *See* Cal. Penal Code § 631(a).

150. Within the relevant time period, the Tracking Entities, through the use of the Tracking Tools, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff Shofet and the California Subclass members, contemporaneous with the communications transit through or passing over any wire, line or cable or with the communications sending from or being received at any place within California.

151. The information collected by the Tracking Tools was not for the sole benefit of Defendant. Within the relevant time period, Defendant aided, agreed with, and employed the Tracking Entities to accomplish the wrongful conduct at issue here.

152. Plaintiff Shofet and the California Subclass members did not authorize or consent to the tracking, interception, and collection of any of their electronic communications.

**COUNT IV**
**VIOLATIONS OF THE WIRETAP ACT**
**18 U.S.C. § 2510, et seq.**
**(On Behalf of Plaintiffs and the Class)**

153. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

154. Plaintiffs bring this cause of action on behalf of themselves and all Class members.

155. The federal Wiretap Act prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. *See* 18 U.S.C. § 2511.

156. The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

157. The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

158. The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

159. The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part

by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

160. The Wiretap Act defines "person" to include any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

161. Plaintiffs, Defendant, and the Tracking Entities are "persons" within the meaning of the Wiretap Act.

162. The Tracking Tools, Plaintiffs' devices and browsers, and Defendant's website server constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

163. Plaintiffs had a reasonable expectation of privacy in their electronic communications with Defendant's Website, including the pages they viewed, browsing activity, and other interactions with Website features, particularly where Defendant represented through its Privacy Banner and Cookie Settings that users could reject all tracking and all non-required cookies.

164. Within the relevant time period, Plaintiffs' electronic communications with the Website were intercepted contemporaneously at the moment they were collected by the Tracking Tools and transmitted to Tracking Entities without Plaintiffs' consent from Plaintiffs' browser, for the unlawful purpose of monetizing the Plaintiffs' intercepted information, including for combining that information with information collected about Plaintiffs from across the Internet via the same Tracking Tools and used for advertising, analytics, and marketing optimization.

165. Interception occurred whenever Plaintiffs interacted with the Website, including when they navigated webpages, viewed content, or otherwise communicated information to the Website through their browsers.

166. At all relevant times, Defendant's conduct was knowing, willful, and intentional. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on its Website and understood that doing so would result in the interception and transmission of users' communications to the Tracking Entities.

167. Plaintiffs did not consent to the interception, recording, disclosure, or use of their electronic communications with the Website by the Tracking Entities. To the contrary, Plaintiffs affirmatively declined Tracking Entities' tracking through Defendant's Privacy Banner.

168. The unauthorized interception and use of Plaintiffs' electronic communications by the Tracking Entities were only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website. 18 U.S.C. § 2511(1)(a).

169. As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiffs have been damaged and are entitled to relief under 18 U.S.C. § 2520, including:

a. damages in an amount to be determined at trial, assessed as the greater of actual damages suffered by Plaintiffs and any profits made by the intercepting parties as a result of the violations, or

b. statutory damages of the greater of $100 per day per violation or $10,000; appropriate equitable and declaratory relief; and

c. reasonable attorneys' fees and costs.

## COUNT V
## COMMON LAW FRAUD, DECEIT, AND/OR MISREPRESENTATION
## (On Behalf of Plaintiffs and the Class)

170. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

171. Plaintiffs bring this cause of action on behalf of themselves and all Class members.

172. Defendant made affirmative representations to users through its Privacy Banner, Cookie Settings, and related disclosures that users could decline all non-necessary cookies.

173. Defendant represented that exercising those options would limit or prevent the deployment of Tracking Tools, including analytics and marketing cookies, and would stop the transmission of users' browsing activity, interactions, and related data to the Tracking Entities.

174. Defendant made these representations at the time users first accessed the Website and again when users were prompted to review and confirm their cookie preferences.

175. These representations were false and misleading. Before users, including Plaintiffs and the Class members, were able to decline all unnecessary cookies, Defendant deployed the Tracking Tools to intercept and collect Plaintiffs' and the Class members' Sensitive Information and transmit the same to the Tracking Entities.

176. Defendant knew the representations were false or misleading, or acted with reckless disregard for their truth, because Defendant controlled the Website's source code, selected and configured the Tracking Tools, and determined how those tools operated in relation to users' expressed privacy choices. Defendant also received reports on the Tracking Tools functionality, which would have alerted Defendant to decreased information intake if its "opt-in" Tracking Tool scheme was functioning as described.

177. Defendant had the technical ability to prevent data transmissions and to configure the Website so that non-essential tracking ceased when users declined such tracking. Industry-standard tools, configurations, and consent-management frameworks exist that permit websites to block, defer, or condition the loading of non-essential Tracking Tools based on users' preferences, and Defendant could have implemented such measures.

178. Defendant made misrepresentations with the intent to induce reliance by users, including Plaintiffs, by reassuring them that they could meaningfully control tracking while Defendant continued to collect and transmit data for its own commercial benefit.

179. Plaintiffs and the Class members reasonably and justifiably relied on Defendant's misrepresentations by continuing to use the Website and by exercising the decline controls instead of avoiding the Website, withholding information, or taking additional steps to protect their privacy.

180. Plaintiffs' and the Class members' reliance was reasonable because Defendant presented the Privacy Banner and Cookie Settings as mechanisms for exercising legally protected privacy rights and for controlling the collection and sharing of personal information.

181. As a direct and proximate result of Defendant's fraudulent conduct, Plaintiffs and the Class members suffered damages, including loss of privacy, loss of control over their personal information, and diminution in the value of their personal data. Plaintiffs and the Class members suffered injury, including unauthorized disclosure of their communications, loss of control over their personal information, and loss of the privacy protection Defendant represented it would provide.

182. Defendant's conduct also resulted in Defendant obtaining an unjust and improper benefit by continuing to collect, use, and monetize users' data despite representing that such practices would cease upon declining.

183. Plaintiffs and the Class members seek all available relief for Defendant's fraudulent conduct, including compensatory damages, restitution, disgorgement, punitive damages where available, and injunctive relief to prevent further misrepresentations.

**COUNT VI**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

184. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

185. Plaintiffs bring this cause of action on behalf of themselves and all Class members.

186. Defendant obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiffs' and the Class members' Sensitive Information, which Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

187. It is unjust that Defendant retains those benefits under circumstances in which the information was collected and transmitted in breach of the representations made to users and without valid consent.

188. Plaintiffs and the Class members conferred these benefits on Defendant, and Defendant has been unjustly enriched at the expense of Plaintiffs and the Class members. Equity and good conscience require restitution or disgorgement of the benefits unjustly retained by Defendant. Therefore, Plaintiffs and the Class members are entitled to the relief set forth below.

**PRAYER**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, seek judgment against Defendant, as follows:

a. An order certifying the class and making all appropriate class management orders;

b. For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the respective Class and Subclasses and their counsel as Class Counsel;

c. For an order declaring the Defendant's conduct violates the statutes referenced herein;

d. For an order finding in favor of Plaintiffs, the Class, and the California Subclass, on all counts asserted herein;

e. Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Defendant to immediately (i) remove the Tracking Tools from the Website or (ii) add, and obtain, the appropriate consent from Website users;

f. An award of statutory damages or penalties to the extent available;

g. For damages in amounts to be determined by the Court and/or jury;

h. For pre-judgment interest on all amounts awarded;

i. For an order of restitution and all other forms of monetary relief;

j. An award of all reasonable attorneys' fees and costs; and

k. Such other and further relief as the Court deems necessary and appropriate.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs demand a trial by jury of all issues so triable.

Dated: November 10, 2026

**ELLZEY KHERKHER SANFORD MONTGOMERY, LLP**

*/s/ Leigh S. Montgomery*
Leigh S. Montgomery
Tex. Bar No. 24052214
4200 Montrose Blvd., Ste. 200
Houston, Texas 77006
Telephone: (888) 350-3931
Email: lmontgomery@eksm.com
Service only: service@eksm.com

Mark S. Reich*
Mark H. Jensen*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: mjensen@zlk.com

*Counsel for Plaintiffs*

*admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of November 2026, the foregoing document was electronically filed with the Court using CM/ECF, which will send notification of this filing to counsel of record in the above-captioned case.

*/s/ Leigh S. Montgomery*
Leigh S. Montgomery